UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.N. and C.N. *individually, and on behalf of E.N., a minor*,

Plaintiffs,

v.

KATONAH-LEWISBORO SCHOOL DISTRICT;
NEW YORK STATE EDUCATION DEPARTMENT;
OFFICE OF STATE REVIEW; JUSTYN P. BATES;
STATE REVIEW OFFICER, in his official capacity;
DR. JOHN B. KING, JR., COMMISSIONER OF
EDUCATION, in his official capacity,

Defendants.

Case No. 14-CV-3845 (KMK)

OPINION & ORDER

<u>Appearances</u>

Peter D. Hoffman, Esq.
Law Office of Peter D. Hoffman, PC
Katonah, NY
*Counsel for Plaintiffs*

James P. Drohan, Esq.
David H. Strong, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant Katonah-Lewisboro School District*

KENNETH M. KARAS, United States District Judge:

M.N. and C.N. (collectively, "Plaintiffs"), bring this Action individually, and on behalf of their child E.N., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking compensatory education for the 2010-11 and 2011-12 school years and full reimbursement for their unilateral placement of E.N. at The Grove School ("Grove") for the 2012-13 school year as a remedy for the alleged failure of the Katonah-Lewisboro Union Free School District ("Defendant," or the "District") to provide a free appropriate public education

("FAPE") to E.N. during the 2010-11, 2011-12, and 2012-13 school years.  Before the Court is

Defendant's Motion for Summary Judgment (the "Motion").  For the reasons set forth below, the

Motion is granted.

## I.  Background

### A.  Factual Background

Because district courts generally owe appropriate deference to the findings of fact by a

the State Review Officer ("SRO"), *see S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ.*, No. 12-CV-

435, 2014 WL 1311761, at *1 (E.D.N.Y. Mar. 30, 2014) (noting that the district court "is not an

expert on education or childhood learning disabilities" and thus awarding "appropriate

deference" to "[t]he SRO's findings of fact"), this Court adopts the SRO's factual findings unless

otherwise noted below, *see id.* (adopting "the SRO's findings of fact as its own unless otherwise

noted"); *T.L. ex rel. B.L. v. Dep't of Educ.*, No. 10-CV-3125, 2012 WL 1107652, at *1 n.1

(E.D.N.Y. Mar. 30, 2012) (giving "the SRO's well-supported findings of fact . . . due deference"

and "therefore adopt[ing] the SRO's findings of fact as its own" (internal quotation marks

omitted)).  For the sake of convenience, however, the facts most relevant to the instant Motion

are restated below.

#### 1.  E.N.'s Educational History

E.N. attended school in the District from September 2003 (kindergarten) through June

2011 (eighth grade).  (State Review Officer Decision ("SRO Op.") 2 (citing Tr. 125; *id.* at 149;

D-5, at 1).)[1]  From the beginning of the 2008-09 school year through December 2011, E.N.

---

[1] As used herein, the District's exhibits from the underlying administrative proceeding are identified by "D-," and Plaintiffs' exhibits are identified by "P-."  "IHO-" refers to Impartial Hearing Officer exhibits, and "Tr.-" refers to the pages of the transcript from the impartial hearing.

received services from Dr. Marta P. Flaum ("Dr. Flaum"), a private psychologist.  (*Id.* (citing Tr. 876–77).)  In November 2009, Dr. Flaum administered the Gray Oral Reading Test to E.N., concluding E.N. did "not qualify for school[-]based interventions," (P-B, at 2), but recommending that Plaintiffs have E.N. referred for a full evaluation, (SRO Op. 2 (citing P-B)).[2] Upon Plaintiffs' request, the District performed its own reading assessment of E.N. in November 2009.  (*Id.* at 3 (citing Tr. 493–94; *id.* at 532–33; D-63).)

For the 2011-12 school year (ninth grade), Plaintiffs enrolled E.N. at Soundview Preparatory School ("Soundview"), a general education private school located outside of the District.  (*Id.* (citing, inter alia, P-N, at 1–3).)  E.N. did not receive any special education services or supports while at Soundview.  (*Id.* (citing Tr. 172).)

As of December 2011, E.N. began seeing Dr. Joseph P. Damore, Jr. ("Dr. Damore"), a private psychiatrist.  (*Id.* (citing Tr. 1270–71).)  In January 2012, Dr. Damore diagnosed E.N. as having a mood disorder, not otherwise specified, which was later changed to a diagnosis of Bipolar Disorder, Type II, as well as with a Parent-Child Relational Problem.  (*Id.* (citing D-66, at 100, 155).)[3]  He reported that during the 2011-12 school year, E.N. struggled to regulate her mood and behavior, experienced difficulties completing activities of daily living related to hygiene, and engaged in behaviors that resulted in a 24-hour emergency room visit, a suspension from Soundview, and loss of privileges at home.  (*Id.* (citing P-I, at 1–2).)  Dr. Damore prescribed E.N. medication, and she continued to participate in psychotherapy sessions with him

---

[2] As discussed in greater detail below, the record indicates that Dr. Flaum did not provide Plaintiffs with her report until at least six months after the administration of the test and also that the report was not provided to the District prior to April 2010.  (*See* Tr. 794–96; *id.* at 879–80; P-B.)

[3] When citing to District Exhibit 66, the Court adopts the approach of the SRO and references the identified page number out of 381.  (*See* SRO Op. 3 n.3.)

from December 2011 through September 7, 2012.  (*Id.* (citing Tr. 1278; D-5, at 1, 7; D-7, at 1; D-66, at 95–211).)

      After Plaintiffs inquired about the Committee on Special Education ("CSE") process in March 2012, the District informed them that E.N. could only be referred to the CSE if she were registered and attending school in the District.  (*Id.* (citing Tr. 1097–99; P-J).)  By letter dated May 8, 2012, Plaintiffs requested an "emergency CSE evaluation," informing the District that E.N. had been diagnosed with a bipolar disorder and would not return to Soundview because they felt the school could not provide the academic support she needed.  (*Id.* (citing D-12).)  The letter indicated that Plaintiffs were requesting an evaluation to prepare for the 2012-13 school year.  (*Id.* (citing D-12).)  The District responded on May 18, 2012 and provided the necessary paperwork for the CSE referral.  (*Id.* at 4 (citing P-Q, at 1).)  Plaintiffs returned a signed copy of their Consent for Initial Evaluation that same day.  (*Id.* (citing D-13).)

      The District initiated the evaluation process in May 2012, (*id.* (citing D-5; D-6; D-7; D-8)), and the CSE convened on July 11, 2012 to determine E.N.'s initial eligibility for special education and related services, (*id.* (citing D-1, at 1)).  CSE Chairperson Connie Hayes ("Hayes"), a school psychologist, a special education teacher, a general education teacher, Plaintiffs, and Dr. Damore participated in that CSE meeting.  (*Id.* (citing D-1, at 1).)  The CSE found E.N. eligible for special education as a student with an emotional disturbance and recommended that she be placed in an 8:1+1 special class in the "home public school district" with related services of two individual counseling sessions per week.  (*Id.* (citing D-1, at 1, 10, 13).) [4]  The July 2012 CSE also recommended a weekly psychiatric consult in the classroom,

---

[4] There is no dispute as to E.N.'s eligibility for special education programs and related services for the 2012-13 school year.  (*See* SRO Op. 4 n.5.)

provided for program modifications and accommodations, and developed a coordinated set of transition activities to facilitate E.N.'s movement from school to post-school activities.  (*Id.* (citing D-1, at 10–12).)  In addition, the July 2012 Individualized Education Program ("IEP") noted that the CSE would explore therapeutic day programs for E.N., (*id.* (citing D-1, at 13)), and Plaintiffs provided consent to send referral packets to such programs, (*id.* (citing D-1, at 2; D-17; P-R)).  The July 2012 IEP also indicated that the CSE would contact a Board of Cooperative Educational Services ("BOCES") home program to inquire about in-home services to address Plaintiffs' concerns about E.N.'s refusal to get out of bed and go to school.  (*Id.* (citing D-1, at 2).)

The District subsequently provided Plaintiffs with prior written notice specific to the CSE determination that E.N. was eligible to receive special education and related services as a student with a disability.  (*Id.* (citing D-18).)  By mid-July 2012, the District sent referral packets to several State-approved day programs in an effort to find an appropriate therapeutic support program for E.N.  (*Id.* (citing D-55, at 1–2; D-56, at 2–5).)  On July 27, 2012. Plaintiffs met with Hayes to discuss the July 2012 IEP and their specific concerns regarding the placement.  (*Id.* (citing Tr. 289–90; *id.* at 301–02; *id.* at 1105–06; D-36, at 1–2).)  Also on July 27, 2012, the District sent Plaintiffs a letter notifying them that the Board of Education had reviewed and approved the recommendations made by the July 2012 CSE.  (*Id.* at 4–5 (citing D-2).)

By letter dated August 2, 2012, Grove informed Plaintiffs of E.N.'s acceptance for the 2012-13 school year.  (*Id.* at 5 (citing P-T).)[5]  On August 28, 2012, Plaintiffs counter-signed the

---

[5] Grove is a residential boarding school located in Madison, Connecticut.  (*See* Tr. 774–75, 834.)  E.N. was enrolled there at the time of the impartial hearing.  (*See id.* at 774–75.)

letter acknowledging their understanding of the tuition and acceptance terms of acceptance. (*Id.* (citing P-T).)

By letter dated August 15, 2012, the relevant BOCES program notified the District that E.N. was accepted to a Therapeutic Support Program-Fragile ("TSP-F") located at a public high school and confirmed that this would be an appropriate special education program for her. (*Id.* (citing D-58, at 1).)  The acceptance letter indicated the program's decision to accept E.N. was based on its review of the July 2012 IEP and supporting documentation as well as of an intake and observation of E.N. conducted by Dr. Kenneth Mann ("Dr. Mann"), a school psychologist employed by BOCES. (*Id.* (citing D-58, at 1).)

In an August 21, 2012 letter to the District, Plaintiffs expressed their concerns regarding the July 2012 IEP and prior written notice. (*Id.* (citing D-36, at 1–2).)  The letter also indicated that Plaintiffs continued to pursue residential school program options on their own and had received acceptance for E.N. at Grove, where she would attend school beginning on September 10, 2012. (*Id.* (citing D-36, at 3).)  Plaintiffs informed the District that although they rejected the July 2012 IEP and were convinced a residential program was the only appropriate option to meet E.N.'s needs, they would continue to cooperate with the CSE. (*Id.* (citing D-36, at 2–3).)

The CSE reconvened on August 28, 2012 for E.N.'s program review. (*Id.* (citing D-3, at 1; P-GG).)  The participants were largely the same as those who had attended the July 2012 CSE meeting, except Dr. Damore did not attend, and Plaintiffs and the District each had counsel present. (*Id.* (citing D-1, at 1; D-3, at 1).)  The August 2012 CSE recommended placement in an 8:1+1 BOCES class located in a public high school, with counseling as a related service. (*Id.*

(citing D-3, at 1, 11, 14).)[6]  The August 2012 CSE also specified that E.N. receive before and after school intervention services ("BASIS") at home in order to address her unwillingness to get up and ready for school.  (*Id.* (citing D-3, at 2, 11).)  All other recommendations specific to goals, supplementary aids and services, supports for school personnel, testing and test accommodations, a coordinated set of transition activities, a consultant psychiatrist, and transportation remained the same as those recommended by the July 2012 CSE.  (*Id.* at 5–6 (citing D-1, at 6–13; D-3, at 9–14).)  In addition, the CSE recommended a functional behavioral assessment ("FBA") and behavioral intervention plan ("BIP") to address E.N.'s compliance with getting ready for and staying in school.  (*Id.* at 6 (citing D-3, at 2).)

The August 2012 IEP also included a recommendation for staffing for the first 10 weeks of the 2012-13 school year to ensure E.N. did not have unsupervised time during the school day, by way of supervised lunch and an escort to and from the bus.  (*Id.* (citing D-3, at 3).)  The CSE planned to reconvene after the first 10 weeks of school (or earlier upon parental request) to review E.N.'s program.  (*Id.* (citing D-3, at 3).)  The August 2012 IEP noted Plaintiffs' disagreement with the CSE's recommendation and continued belief that a residential program was necessary to meet their family's needs.  (*Id.* (citing D-3, at 3).)[7]  The District provided Plaintiffs with prior written notice dated August 28, 2012, which indicated that the CSE, with the

---

[6] The August 2012 IEP maintained the same frequency of counseling as in the July 2012 plan but modified the recommended delivery from two individual sessions per week to one individual session and one group session.  (SRO Op. 5 n.9 (citing D-1, at 1, 10; D-3, at 1, 11).)

[7] Although Plaintiffs disagreed with the recommendation for a therapeutic day program, they agreed to consider The Clear View School, another therapeutic day program, and to reconvene the CSE after completing the referral process.  (SRO Op. 6 n.11 (citing D-3, at 2; P-GG).)

exception of Plaintiffs, agreed that E.N.'s needs could be met by the BOCES TSP-F day

program, supported by BASIS.  (*Id.* (citing D-21, at 1).)

In the weeks following the August 2012 CSE meeting, Plaintiffs and Hayes exchanged a

number of e-mails, including one in which Plaintiffs notified the District that they had not yet

heard from the BASIS program and felt that they needed to do so before proceeding with the

next CSE meeting.  (*Id.* (citing P-U).)  On September 5, 2012, Hayes e-mailed Plaintiffs,

indicating that she was unable to connect with anyone from the BASIS program and providing

contact information for another service provider, Vital Behavior Services ("VBS"), which had

confirmed that it could meet E.N.'s needs.  (*Id.* (citing P-U, at 5).)  Also on September 5, 2012,

Plaintiffs reminded Hayes that E.N. would begin at Grove on September 10, 2012.  (*Id.* at 7

(citing P-U, at 4).)  Hayes responded the next day, expressing her hope that Plaintiffs would try

the CSE-recommended placement before placing E.N. privately.  (*Id.* (citing P-U, at 4).)  Later

that day, Plaintiffs replied that they did not believe the District had offered an appropriate

program to meet E.N.'s needs, particularly due to the lack of clarity about the BASIS and VBS

programs.  (*Id.* (citing P-U, at 3).)  On September 7, 2012, Plaintiffs informed Hayes that they

had been in contact with the BASIS and VBS programs.  (*Id.* (citing P-U, at 3).)

By letter dated October 1, 2012, Plaintiffs explained that they rejected the program

recommended in the August 2012 IEP, would reject the program even if the BOCES TSP-F

program were replaced with The Clear View School, believed a residential therapeutic school

was necessary to meet E.N.'s needs, and had placed E.N. at Grove.  (*Id.* (citing D-37).)  Plaintiffs

concluded the letter by asking when the next CSE meeting would be scheduled so that they could

discuss their intent to commence an impartial hearing.  (*Id.* (citing D-37).)  The District

responded by e-mail on October 12, 2012, indicating it believed that the recommended program

had been appropriate and would reconvene the CSE if Plaintiffs had new information that they wished to be considered.  (*Id.* (citing P-U, at 1).)

### 2.  Due Process Complaint

Plaintiffs filed a due process complaint notice on December 10, 2012, alleging that the District failed to offer E.N. a FAPE for the 2008-09, 2009-10, 2010-11, 2011-12, and 2012-13 school years.  (*Id.* (citing IHO-4, at 9–27).)[8]  Plaintiffs also alleged that the District should have referred E.N. to the CSE for an initial evaluation as far back as the 2006-07 school year but failed to fully evaluate her until May 2012.  (*Id.* at 7–8 (citing IHO-4, at 8–20).)  For relief, Plaintiffs sought compensatory education for the 2010-11 and 2011-12 school years as well as tuition reimbursement—including clinical costs, room and board, and transportation—for E.N.'s attendance at Grove for the 2012-13 school year.  (*Id.* at 9 (citing IHO-4, at 30).)

### a.  Impartial Hearing Officer's Decision

The impartial hearing took place over 11 days between March 27, 2013 and on May 31, 2013.  (*Id.* (citing Tr. 1–1502).)  As noted by the SRO, (*see* SRO Op. 9), the 43-page decision of the Impartial Hearing Officer ("IHO") provides a comprehensive summary of the testimonial evidence adduced at the impartial hearing, (*see* Impartial Hearing Officer Findings of Fact and Decision ("IHO Op.") 8–40).  The Court, therefore, merely identifies those individuals whose testimony will bear on the resolution of the instant Motion:

- Hayes, Director of Special Services for the District;

- Claire Balassi ("Balassi"), E.N.'s eighth grade social studies teacher;

- Annmarie MacSweeney ("MacSweeney"), E.N.'s guidance counselor in the District;

---

[8] While asserting that the District denied E.N. a FAPE for the 2008-09 through 2012-13 school years, Plaintiffs only requested relief with respect to the 2010-11, 2011-12, and 2012-13 school years.  (SRO Op. 7–8 n.12 (citing IHO-4, at 30).)

- Dr. Mann, BOCES school psychologist;

- Amy Baisley ("Baisley"), E.N.'s seventh grade English Language Arts ("ELA") teacher;

- C.N., E.N.'s mother;

- M.N., E.N.'s father;

- Dr. Damore, E.N.'s private psychiatrist.

In a decision dated July 23, 2013, the IHO denied Plaintiffs' request for compensatory education for the 2010-11 and 2011-12 school years and for reimbursement for the cost of E.N.'s placement at Grove for the 2012-13 school year.  (SRO Op. 9–11; *see also* IHO Op. 40–51.)  She also found that the District offered E.N. a FAPE for the 2012-13 school year.  (SRO Op. 10; *see also* IHO Op. 46–51.)

### b.  State Review Officer's Decision

Plaintiffs timely appealed the IHO's decision to the New York Office of State Review ("OSR"), seeking to reverse the IHO's findings with respect to their claims for compensatory education for both the 2010-11 and 2011-12 school years as well as with respect to their request for reimbursement for the cost of E.N.'s tuition at Grove.  (SRO Op. 11–12.)  The SRO rendered a decision on August 20, 2014, concluding "that the evidence in the hearing record establishes that compensatory services are not warranted for the 2010-11 and 2011-12 school years, and that the [D]istrict sustained its burden to establish that it offered [E.N.] a FAPE . . . for the 2012-13 school year."  (*Id.* at 30–31.)[9]  The SRO thereby noted that it need not address the appropriateness of Grove or whether equitable considerations weighed in favor of granting

---

[9] Plaintiffs underscore that the SRO did not render a decision until approximately one year after they appealed the IHO's decision and not until after they commenced this Action.  (*See* Pls.' Resp. to Def.'s Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ¶ 53 (Dkt. No. 76).)

Plaintiffs' requested relief.  (*Id.* at 30 (citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000)).)  Ultimately, the SRO modified the IHO's decision only to the extent of reversing the portion that found that the District was not obligated to evaluate E.N. during the 2011-12 school year.  (*Id.* at 31.)

     B.  Procedural Background

     On May 29, 2014, Plaintiffs commenced this Action against the District; New York State Education Department ("NYSED"); OSR; Justyn P. Bates, SRO ("SRO Bates"); and John B. King, Jr., Commissioner of Education for NYSED ("Commissioner King").  (Dkt. No. 1.)  The District filed its Answer to the Complaint on June 18, 2014.  (Dkt. No. 4.)  NYSED, OSR, SRO Bates, and Commissioner King (collectively, "State Defendants") filed their Answer to the Complaint on August 4, 2014, (Dkt. No. 10), and then filed their Amended Answer on August 21, 2014, (Dkt. No. 11).

     Pursuant to a Scheduling Order adopted by the Court on September 8, 2014, (Dkt. No. 16), State Defendants filed their Motion for Judgment on the Pleadings and supporting papers on October 31, 2014, (Dkt. Nos. 17–19), and the District filed its Motion for Judgment on the Pleadings and supporting papers that same day, (Dkt. Nos. 20–22).  On January 9, 2015, Plaintiffs filed their opposition to both motions, (Dkt. Nos. 30–33), as well as a Cross-Motion to Amend/Correct the Complaint, (Dkt. No. 29).  The District and State Defendants both opposed the Cross-Motion.  (Dkt. Nos. 38, 41–42.)  On February 4, 2015, State Defendants filed a reply relating to their Motion for Judgment on the Pleadings, (Dkt. Nos. 39–40), and Plaintiffs filed a reply in support of their Cross-Motion on February 17, 2015, (Dkt. Nos. 51–52).  After hearing oral argument on September 9, 2015, (*see* Dkt. (minute entry for Sept. 9, 2015)), the Court

granted State Defendants' Motion for Judgment on the Pleadings, denied the District's Motion for Judgment on the Pleadings as moot, denied Plaintiffs' Cross-Motion to Amend/Correct the Complaint as to State Defendants, and granted Plaintiffs' Cross-Motion to Amend/Correct the Complaint as to the District, (Dkt. No. 62).

Plaintiffs filed an Amended Complaint against the District on October 21, 2015. (Dkt. No. 68.) Pursuant to a briefing schedule approved by the Court, (Dkt. No. 64), the District filed its Motion for Summary Judgment and accompanying papers on November 16, 2015, (Dkt. Nos. 71–73). Plaintiffs filed their opposition on December 16, 2015, (Dkt. Nos. 75–76), and the District filed reply papers on January 15, 2016, (Dkt. Nos. 78–79).

## II. Discussion

### A. Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public education" to "all children with disabilities." 20 U.S.C. § 1412(a)(1)(A); *see also Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982) (describing the IDEA's predecessor statute as an "ambitious federal effort to promote the education of handicapped children"). A school district provides a FAPE when it offers "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citation and some internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 207). These services are set forth in the child's IEP, "the central mechanism by which public schools ensure that their disabled students receive a [FAPE]." *Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002); *see also* 20 U.S.C. §§ 1414(d)(1)(A)–(B), (d)(3) (setting out requirements for IEPs and their development).

"The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012). Rather, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted). "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130). Indeed, the IDEA does not require schools to "maximize the potential" of students with disabilities, but instead was intended "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *M.H.*, 685 F.3d at 245 (internal quotation marks omitted).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A); *see also M.H.*, 685 F.3d at 224–26 (generally describing the IHO and SRO process).

The Supreme Court has repeatedly held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from the school district for the private placement of their child. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7,

12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).  The IDEA

allows a district court hearing civil actions brought under the IDEA to grant "such relief as the

court determines is appropriate."  *Forest Grove*, 557 U.S. at 237 (quoting 20 U.S.C.

§ 1415(i)(2)(C)(iii)).  However, parents who unilaterally withdraw their child from the public

schools in favor of a private placement do so at their own financial risk.  *See A.C. ex rel. M.C. v.*

*Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009).

      In deciding whether tuition reimbursement for such a private placement is warranted, a

court must first consider (1) "whether the state has complied with the procedures set forth in the

IDEA," and (2) "whether the IEP developed through the [IDEA's] procedures is reasonably

calculated to enable the child to receive educational benefits."  *Cerra*, 427 F.3d at 192 (alteration

and internal quotation marks omitted).  If the answer to these questions is yes, no reimbursement

is permissible.  *See id.* ("If these requirements are met, the State has complied with the

obligations imposed by Congress[,] and the courts can require no more." (internal quotation

marks omitted)).  If no, the court then considers (3) "whether the private schooling obtained by

the parents is appropriate to the child's needs."  *Id.*  Where that is the case, "equitable

considerations" must "support the [parents'] claim."  *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193,

205 (S.D.N.Y. 2010); *see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363–64 (2d Cir. 2006)

("[E]quitable considerations [relating to the reasonableness of the action taken by the parents]

are relevant in fashioning relief." (second alteration in original) (quoting *Burlington*, 471 U.S. at

374)).  Because a court may order "such relief" as it deems "appropriate," 20 U.S.C.

§ 1415(i)(2)(C)(iii), and because a reimbursement award is discretionary, *see id.*

§ 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the

parents for the cost of [private] enrollment . . . ."), courts "enjoy[] broad discretion in considering

equitable factors relevant to fashioning relief," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citing *Carter*, 510 U.S. at 16).

The IDEA also provides for a second remedy:  compensatory education.  *See Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 456 (2d Cir. 2015).  This form of prospective equitable relief "serves to compensate a student who was actually educated under an inadequate IEP and to catch-up the student to where [she] should have been absent the denial of a FAPE."  *S.A.*, 2014 WL 1311761, at *7 (internal quotation marks omitted); *see also Mr. & Mrs. P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 123 (2d Cir. 2008) (noting that "compensatory education is an available option under the [IDEA] to make up for denial of a [FAPE]").  "An award of compensatory education is appropriate only for gross violations of the IDEA."  *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 109 n.2 (2d Cir. 2008).

B.  Standard of Review

Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).  Rather, "the procedure [in IDEA cases] is in substance an appeal from an administrative determination, not a summary judgment motion."  *M.H.*, 685 F.3d at 226 (alteration and internal quotation marks omitted).

This posture means that the court owes "a significant degree of deference to the state educational agency, as [it is] essentially acting in an administrative-law-style capacity."  *Mr. & Mrs. P.*, 546 F.3d at 118.  The court "must give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Gagliardo*, 489 F.3d at 113

15

(second alteration in original) (quoting *Rowley*, 458 U.S. at 206); *see also Cerra*, 427 F.3d at 191 (explaining that the "IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy").  While a reviewing court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," *M.H.*, 685 F.3d at 240 (internal quotation marks omitted), such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," *Rowley*, 458 U.S. at 206.  Rather, the standard for reviewing administrative determinations "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review.  In the course of this oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." *M.H.*, 685 F.3d at 244 (alterations, italics, and internal quotation marks omitted).

"Deference is particularly appropriate when . . . the [SRO's] review has been thorough and careful." *Mr. & Mrs. P.*, 546 F.3d at 118 (alteration in original) (quoting *Walczak*, 142 F.3d at 129).  Specifically,

> the deference owed to an SRO's decision depends on the quality of that opinion. Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks omitted); *see also M.H.*, 685 F.3d at 241 ("The SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." (quoting *Gagliardo*, 489 F.3d at 114)).  This deference is further amplified when the IHO and SRO reach the same conclusion based on the same record before a court.  *See B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343,

360 (E.D.N.Y. 2014) ("[D]eference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before the district court.").  Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO.  *See M.H.*, 685 F.3d at 244.

### C.  Application

As an initial matter, the Court finds that Plaintiffs have failed to show that the SRO's decision is not entitled to deference.  Though Plaintiffs complain that "[t]he SRO did not address the second and third prongs of the *Burlington* test," (Pls.' Opp'n to Def.'s Mot. ("Pls.' Opp'n") 3 (Dkt. No. 75)), the SRO had no obligation to do so after having concluded that that the District offered E.N. a FAPE, *see J.M. v. N.Y.C. Dep't of Educ.*, — F. Supp. 3d —, 2016 WL 1092688, at *6 (S.D.N.Y. Mar. 21, 2016) ("If . . . the school district is found to have offered the student a FAPE, then 'the necessary inquiry is at an end' and the second and third prongs of the *Burlington/Carter* test need not be considered." (quoting *M.C.*, 226 F.3d at 66)).[10]  Plaintiffs also argue that the SRO should not be afforded deference because the SRO's decision "was egregiously late."  (Pls.' Opp'n 3.)  While the Court appreciates their frustration, "no authority permits courts to give less respect to SRO decisions on the basis of delay, nor is there any logical reason to do so."  *P.S. v. N.Y.C. Dep't of Educ.*, No. 13-CV-4772, 2014 WL 3673603, at *7 n.3

---

[10] "According to the three-part *Burlington/Carter* test," parents will be entitled to reimbursement for private school educational services where:  "(1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement."  *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).

(S.D.N.Y. July 24, 2014); *see also M.L. v. N.Y.C. Dep't of Educ.*, No. 13-CV-574, 2014 WL 1301957, at *13 (S.D.N.Y. Mar. 31, 2014) (acknowledging "that the [SRO's] routine delays in issuing decisions is problematic" but finding "no authority in IDEA cases that allows [the court] to declare the SRO's decision a nullity" (internal quotation marks omitted)).  On the whole, notwithstanding Plaintiffs' bare assertion that the SRO "fail[ed] to credit significant evidence clearly established by Plaintiffs at the [i]mpartial [h]earing," (Pls.' Opp'n 3), the Court finds that the SRO's 31-page decision reflects a comprehensive review of the record and soundly marshals the evidence in support of its findings.  Moreover "the IHO and SRO decisions are in agreement and are based on the same record as that before the . . . [C]ourt." *B.K.*, 12 F. Supp. 3d at 360; *see also M.T. v. N.Y.C. Dep't of Educ.*, No. 14-CV-10124, 2016 WL 1267794, at *5 (S.D.N.Y. Mar. 29, 2016) (explaining that "the court should 'afford more deference' to the SRO's decision" where its "'review is based entirely on the same evidence as that before the SRO'" and "when the IHO and SRO are in agreement" (quoting *M.H.*, 685 F.3d at 244)).[11]  Because "[c]ourts generally defer to the final decision of the state authorities" if the "review has been thorough and careful," *M.H.*, 685 F.3d at 241 (internal quotation marks omitted), and because the SRO's conclusions are supported by the evidence, the SRO's decision is entitled to deference here.

     In this case, the SRO, like the IHO, found that compensatory services were not warranted for the 2010-11 and 2011-12 school years and that the District sustained its burden of establishing that it offered E.N. a FAPE for the 2012-13 school year.  (*See* SRO Op. 30; IHO Op.

---

[11] In its sole departure from the IHO's decision, (*see* IHO Op. 45 (determining that "that the district of location, not the . . . [D]istrict, was charged with engaging in child find activities")), the SRO determined that Plaintiffs' "placement of [E.N.] at Soundview after the [D]istrict failed to respond to [their] request for an evaluation does not absolve the [D]istrict of its obligations . . . to evaluate [E.N.] during the 2011-12 school year," (SRO Op. 16).  This distinction, however, is of limited import, as the SRO affirmed the IHO's findings in all other respects.  (*See id.* at 30–31.)

44–45, 48.)  Plaintiffs seek to persuade the Court otherwise, and the Court will address each claim in turn.

### 1.  Whether Plaintiffs are Entitled to Compensatory Education for the 2010-11 and 2011-12 School Years

Plaintiffs contend that they are entitled to compensatory education for the 2010-11 and 2011-12 school years on the basis that the District failed to provide E.N. a FAPE during those years.  (*See* Pls.' Opp'n 1, 4–10.)[12]

### a.  The 2010-11 School Year (Eighth Grade)

With respect to E.N.'s eighth grade year, Plaintiffs argue that the District violated its child find obligation by failing to refer E.N. to the CSE after Plaintiffs requested an evaluation.

---

[12] The District contends that Plaintiffs waived their compensatory education claims for the 2010-11 and 2011-12 school years by failing to identify the specific services—in either their due process complaint, appeal, or Amended Complaint—to which they believe they are entitled. (*See* Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") 21–22 (Dkt. No. 72); Def.'s Reply Mem. of Law in Supp. of Mot. ("Def.'s Reply") 1 (Dkt. No. 78).)  They do not, however, offer any authority suggesting that such specification is necessary to preserve the more general argument of entitlement to compensatory education.  (*See generally* Def.'s Mem.; Def.'s Reply.) By contrast, it is well settled that "a party's failure to raise *an argument* during administrative proceedings generally results in a waiver of that argument."  *B.P. v. N.Y.C. Dep't of Educ.*, No. 14-CV-1822, 2014 WL 6808130, at *7 (S.D.N.Y. Dec. 3, 2014) (emphasis added) (internal quotation marks omitted), *aff'd*, 634 F. App'x 845 (2d Cir. 2015).  Here, not only was the argument related to compensatory education raised before the IHO, (*see* Tr. 10–14), but also the SRO addressed the issue, (*see* SRO Op. 18–21), finding an award of compensatory services to be unwarranted even while acknowledging that Plaintiffs did not request any specific services, (*see id.* at 20).  As the Amended Complaint expressly seeks reversal of the SRO's decision, (*see* Am. Compl. ¶ 18), and alleges that Plaintiffs "are entitled to compensatory education for the 2011-12 school year," (*id.* ¶ 145), the District had fair notice of this claim, *see S.B. v. N.Y.C. Dep't of Educ.*, 117 F. Supp. 3d 355, 362 (S.D.N.Y. 2015) (explaining that "arguments not directly raised in a [d]ue [p]rocess [c]omplaint are not foreclosed if (1) the [d]ue [p]rocess [c]omplaint provides fair notice to the [school district] of the argument at issue; (2) both the IHO and SRO reach the issue on the merits, giving the federal court a record for review; or (3) the argument goes to the heart of this dispute" (alterations and internal quotation marks omitted)); *cf. C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014) (clarifying that "the waiver rule is not to be mechanically applied" and explaining that the "key to the due process procedures is fair notice and preventing parents from sandbagging the school district by raising claims after the expiration of the resolution period" (alteration and internal quotation marks omitted)).

(*See id.* at 5–9.)[13]  They allege that this inaction ultimately denied E.N. a FAPE for the 2010-11

school year.  (*See id.* at 5–6.)

Pursuant to the IDEA, each state receiving federal funds must "ha[ve] in effect policies

and procedures," 20 U.S.C. § 1412(a), by which it will identify, locate, and evaluate "[a]ll

children with disabilities residing in the State" to determine whether these children require

special education and related services, *id.* § 1412(a)(3)(A).  This "child find" obligation extends

to children "who are suspected of being a child with a disability . . . and in need of special

education . . . ."  34 C.F.R. § 300.111(c)(1); *see also J.S. v. Scarsdale Union Free Sch. Dist.*, 826

F. Supp. 2d 635, 660 (S.D.N.Y. 2011) (same).  Under the IDEA, a "child with a disability"

includes a child with a "serious emotional disturbance . . . who, by reason thereof, *needs special*

*education and related services*."  20 U.S.C. §§ 1401(3)(A)(i)–(ii) (emphasis added).  An

"emotional disturbance" is defined as

> a condition exhibiting one or more of the following characteristics over a long
> period of time and to a marked degree that *adversely affects a student's educational*
> *performance*:
>
> > (i) an inability to learn that cannot be explained by intellectual,
> > sensory, or health factors;
> >
> > (ii) an inability to build or maintain satisfactory interpersonal
> > relationships with peers and teachers;
> >
> > (iii) inappropriate types of behavior or feelings under normal
> > circumstances;
> >
> > (iv) a generally pervasive mood of unhappiness or depression; or

---

[13] It is undisputed that as of December 2010 the District was obligated to initiate the CSE
evaluation process for E.N., (*see* IHO Op. 43; SRO Op. 16; *cf.* Def.'s Mem. 22; Pls.' Opp'n 6),
as a parent's written request triggers the district's obligation to evaluate any student suspected of
having a disability and to determine whether that student is eligible for special education
programs and services, *see* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(a).  As correctly
determined by both the IHO and SRO, (*see* IHO Op. 43; SRO Op. 16), Plaintiffs' December
2010 e-mail constituted that written request, (*see* P-JJ, at 3).

> (v) a tendency to develop physical symptoms or fears associated
> with personal or school problems.

N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(zz)(4) (emphasis added); *see also* 34 C.F.R.

§ 300.8(c)(4)(i) (same).[14]  By contrast, the IDEA does not define the term "needs special

education," and neither the federal nor the New York implementing regulations define "adverse

effect on educational performance."  *See J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66

(2d Cir. 2000) ("[N]either the IDEA nor the federal regulations define the terms 'need special

education' or 'adverse effect on educational performance,' leaving it to each State to give

substance to these terms."); *A.J. v. Bd. of Educ.*, 679 F. Supp. 2d 299, 307 (E.D.N.Y. 2010)

("[T]he New York regulations do not define 'educational performance.'").  Courts in the Second

Circuit have assessed "educational performance" by reference to academic performance.  *See*

*Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 297 (S.D.N.Y. 2010) ("[A]dverse

effect on 'educational performance' must be determined by reference to academic

performance."); *A.J.*, 679 F. Supp. 2d at 309 ("'[E]ducational performance' must be assessed by

reference to academic performance which appears to be the principal, if not only, guiding

factor."); *cf. C.B. ex rel. Z.G. v. Dep't of Educ.*, 322 F. App'x 20, 22 (2d Cir. 2009) (summary

order) (holding that "[t]he evidence on the record is insufficient to show that [the

student] . . . suffered an adverse impact on her educational performance" where she

"continuously performed well" and "tested above grade-level"); *Mr. & Mrs. N.C. v. Bedford*

*Cent. Sch. Dist.*, 300 F. App'x 11, 13 (2d Cir. 2008) (summary order) (finding that even if the

---

[14] Plaintiffs identify no other disability that should have alerted the District, (*see* Pls.'
56.1 ¶ 14(ii) (asserting that E.N.'s "bipolar disorder is an Emotional Disturbance disability that
prevents her from accessing her education" (citing Tr. 1282))), and the evidence in the record
does not suggest otherwise, *cf.* N.Y. Comp. Codes R. & Regs. tit. 8 §§ 200.1(zz)(1)–(13).

21

student displayed characteristics of an emotionally disturbed child, his educational performance was not adversely affected where he did not fail any classes at school and his grade point average dropped only nine points). As the Supreme Court has instructed, while not "every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a [FAPE]," *Rowley*, 458 U.S. at 203 n.25, "[t]he grading and advancement system . . . constitutes an important factor in determining educational benefit," *id.* at 203; *see also Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93 (2d Cir. 2003) (noting that "[p]assing grades are . . . often indicative of educational benefit").

In this Action, Plaintiffs challenge the SRO's determination that E.N. did not require special education services prior to the second half of the 2011-12 school year. (*See* Pls.' Opp'n 4.) They contend that the SRO's determination that E.N.'s condition did not adversely impact her performance improperly rested on "passing grades and proficient standardized testing scores" alone. (*Id.* at 8 (citing SRO Op. 19).) However, as noted above, "proof of an adverse impact on *academic* performance is a prerequisite for eligibility for special education services under [the] IDEA and New York's implementing regulations." *Maus*, 688 F. Supp. 2d at 297 (emphasis added); *see also A.J.*, 679 F. Supp. 2d at 311 (concluding that where the child "was performing at average to above average levels in the classroom and was progressing academically," his condition "was not affecting his educational performance" and thus he was not eligible for services under the IDEA). Because "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress," *Walczak*, 142 F.3d at 130; *see also C.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933 CS, 2013 WL 1285387, at *13 (S.D.N.Y. Mar. 28, 2013) ("Achievement of passing grades and regular advancement in a general education class . . . is evidence of a FAPE."), it is highly significant that E.N. did just

22

that during the 2010-11 school year, a fact appropriately highlighted by the SRO, (*see* SRO Op. 19 (citing D-11; D-43, at 3; P-H)).[15] Also significant are E.N.'s State assessment scores, as the Second Circuit "has looked to test scores and similar objective criteria" when evaluating whether a child received a FAPE. *Walczak*, 142 F.3d at 130; *see also A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 232 (D. Conn. 2008) (same), *aff'd*, 370 F. App'x 202 (2d Cir. 2010). As noted by the SRO, (*see* SRO Op. 19), in eighth grade E.N. met the proficiency standard for ELA and science as well as the basic standard for mathematics, (*see* Tr. 254–55; D-44, at 5; D-45, at 5; D-46, at 1).

Nevertheless, in addition to these "generally accepted indicators of satisfactory progress," *Walczak*, 142 F.3d at 130, the SRO looked to other considerations in affirming the IHO's conclusion that E.N.'s "disability—if she had been classified at that time—did not adversely impact her performance to the extent that she required special services and programs [during the 2010-11 school year]," (SRO Op. 19 (citing IHO Op. 44)). For one, the IHO cited testimony that E.N. was "a fine student who appeared to have friends" and was "always respectful" in finding that "E.[N.] progressed satisfactorily during her eighth grade year." (IHO Op. 44; *see also* Tr. 455–56 (testimony by Balassi that E.N. "was a fine student" who "was respectful" and "[a]lways wanted to engage")). In his decision, the SRO cited testimony of several witnesses, including Baisley and Balassi, who described the general education supports used to address E.N.'s difficulties with homework. (SRO Op. 19.)[16] Notwithstanding these challenges, (*see* Tr. 465–

---

[15] Indeed, E.N. never failed a course during middle school, and her grades in a number of courses improved. (*See* D-43.) For example, her grades in ELA and Social Studies showed improvement between the second and third trimesters of the 2010-11 school year. (*See id.*, at 3.)

[16] These included extra help sessions, (*see* Tr. 515–16; D-61, at 3, 5, 7–8), and mechanisms for Plaintiffs to monitor E.N.'s progress, (*see* Tr. 736–38; D-61, at 1, 4–5), which "were in line with the recommendations contained in the November 2009 . . . report [by Dr.

66, 475, 483–85, 530, 546–47, 720, 734–35), E.N.'s teachers described "her skills [as] being

very solid," (*id.* at 720; *see also id.* at 734 (testifying that "her skills were strong")), and testified

that "[s]he was a good student," (*id.* at 456).  The SRO additionally highlighted that Dr. Flaum

reported as of November 2009 that E.N. "did not qualify for school[-]based interventions."

(SRO Op. 19–20 (citing P-B, at 2).)  Thus, it is clear from the face of his well-reasoned decision

that the SRO considered a variety of measures, including E.N.'s grades and testing scores, in

finding that E.N. was performing adequately during her eighth grade year.

   In further support of their argument that E.N. required special education services prior to

the second half of the 2011-12 school year, Plaintiffs contend that the District failed to take into

account the results of a private reading evaluation conducted by Dr. Flaum in November 2009.

(Pls.' Opp'n 8–9.)  However, the record indicates that Dr. Flaum's report was not shared with the

District until November 2010, (*see* Tr. 796 (testimony by C.N. that she mailed a copy of Dr.

Flaum's report to MacSweeney in November 2010); *id.* at 879–80 (testimony by C.N. that Dr.

Flaum's report was not shared with the District as of April 2010)), if at all, (*see id.* at 482

(testimony by Balassi that she does not recall being provided with any report from a private

consultant); *id.* at 496 (testimony by MacSweeney that she never received Dr. Flaum's report);

*id.* at 501 (same)).[17]  Plaintiffs emphasize that school officials must take into consideration

independent evaluations obtained by parents, (*see* Pls.' Opp'n 9 (citing 34 C.F.R.

§ 300.502(b)(1))), but such consideration necessarily hinges on the provision of said evaluation

---

Flaum]," (SRO Op. 19 (citing P-B, at 2)).  Yet notably, Balassi testified that E.N.'s work
production difficulties were "nothing of great significance."  (Tr. 469.)

  [17] In claiming the District "did not take Plaintiffs' report into consideration," (Pls.' Opp'n
9 (citing Tr. 495–96, 793–94)), Plaintiffs cite to testimony that merely casts doubt on whether the
District ever received Dr. Flaum's evaluation, (*see* Tr. 495–96, 793–94).

to school officials, *see* 34 C.F.R. § 300.502(c)(1) ("If the parent . . . *shares with the public agency* an evaluation obtained at private expense, the results of the evaluation[] [m]ust be considered by the public agency . . . ." (emphasis added)).  In any event, while Plaintiffs assert that Dr. Flaum's report was "in contradiction" to the reading evaluation used by the District, (Pls.' Opp'n 8–9 (citing P-B; D-63)), Dr. Flaum's report actually indicates that E.N.'s scores on the Gray Oral Reading Test "could also be considered within the average range," despite placing E.N. "in the lowest quartile for reading rate and comprehension," (P-B, at 1–2).  As noted above, Dr. Flaum then concluded that E.N. "does not qualify for school[-]based interventions based on this assessment."  (*Id.*, at 2.)  This, in fact, parallels the reading measures administered by the District, also in November 2009, where E.N. scored above the average range in both reading comprehension and vocabulary on the Stanford Diagnostic Reading Test, and on grade level in comprehension on the Spache Diagnostic assessment.  (D-63, at 1; *see also* P-B, at 1 (noting that assessments administered by the District "place[d] her in the average reading range")).)  Based on this score, the evaluator concluded, similarly to Dr. Flaum, (*see* P-B, at 2), that E.N. did "not qualify for remedial reading services," (D-63, at 1).[18]

Yet, notwithstanding Plaintiffs' suggestion that the District relied exclusively on that reading test in concluding that E.N. was not eligible for services, (*see* Pls.' Opp'n 9 (asserting that the District's "reading test was not all-encompassing" and that "the CSE may not rely on any single procedure as the sole criterion for determining whether a student has a disability" (alteration, citation, and internal quotation marks omitted)), other indicia—like those discussed

---

[18] MacSweeney subsequently called to advise C.N. of those test results and sent her a copy of the report.  (*See* Tr. 798–99.)

above—supported this determination.  (*See, e.g.*, P-H; D-11; D-44, at 5; D-45, at 5; D-46, at 1.)[19]

Indeed, Plaintiffs cite to testimony confirming that State assessments were used to determine

E.N.'s eligibility.  (*See* Pls.' Opp'n 8 (citing, inter alia, Tr. 340); *cf.* Tr. 340–41 (testimony by

Hayes that E.N.'s standardized test scores were "used in conjunction with all of the other

evaluations . . . to make a determination").)

Elsewhere, Plaintiffs assert that "[they] and Dr. Flaum notified [the District] of the

possibility that E[.]N[.] had a disability and required services from the school," (Pls.' Opp'n 7–8

(citing P-E; P-LL, at 13)), but that such "recommendations were ignored," (*id.* at 8 (citing Tr.

547; *id.* at 735–36; *id.* at 1071; P-E)).  The exhibits cited, however, merely include notes from an

April 2010 team meeting that discuss E.N.'s difficulties and raise possible strategies, (P-E), and

email correspondence between Plaintiffs and MacSweeney, in which C.N. mentions that she is

"not sure the teachers can see . . . that [E.N.] needs more support at school," (P-LL, at 13).  Even

accepting Plaintiffs' contention as to the alleged notification, the transcript pages cited by

Plaintiffs indicate that neither MacSweeney nor Baisley recalled what Dr. Flaum said at the April

---

[19] In arguing that the District "should have looked beyond E[.]N[.]'s grades and demeanor at school to determine whether she had a disability," Plaintiffs state that her "bipolar disorder is also a safety issue."  (Pls.' Opp'n 9 (citing, inter alia, Tr. 538; *id.* at 886–87; *id.* at 891–92; *id.* at 922–23).)  The testimony cited, however, is wholly unconnected to any "safety issue."  (*See, e.g.*, Tr. 538 (discussing the dress code at the middle school); *id.* at 886–87 (discussing an incident in eighth grade where E.N. violated the dress code); *id.* at 891–92 (testifying that E.N. had no issues with tardiness, appearance, and hygiene during middle school); *id.* at 922–23 (describing the time E.N. spent getting ready for school in January 2012).)  While C.N. testified that "it was very obvious that [E.N.] had cut herself" in eighth grade, (*id.* at 901), the record does not suggest that such behaviors interfered with E.N.'s school-based performance, (*see, e.g., id.* at 455 (describing E.N. as "a fine student" during the 2010-11 school year); *id.* at 720 (describing E.N. as "friendly, well-liked by her peers and her teachers," and with "very solid" academic skills); *id.* at 885 (testifying that E.N. was never suspended during middle school).)  Moreover, it is not clear from the record that the District was, in fact, aware of any need for safety intervention during the 2010-11 school year.  For example, Balassi testified that she never saw evidence of cutting, (*id.* at 456), or suspected any such issue, (*id.* at 488).

2010 meeting, (*see* Tr. 547 (testimony by MacSweeney that she did not "recall anything Dr. Flaum said at [the] meeting"); *id.* at 735–36 (testimony by Baisley that she could "not specifically" recall what Dr. Flaum said at the meeting)), and that the notes from the meeting do not mention Dr. Flaum, (*id.* at 735).  This is a far cry from proving their contention that "Dr. Flaum's recommendations were ignored."  (Pls.' Opp'n 8.)  It is also worth noting that the IDEA requires only *consideration* of independent educational evaluations, not wholesale adoption of any recommendations.  *See J.D. ex rel. A.P. v. N.Y.C. Dep't of Educ.*, No. 14-CV-9424, 2015 WL 7288647, at *14 (S.D.N.Y. Nov. 17, 2015) (explaining that "the CSE was not required to adopt the [e]valuation's recommendations wholesale," as "the IDEA required the CSE only to 'consider' the [e]valuation" (alteration omitted)); *S.W. v. N.Y.C. Dep't of Educ.*, 92 F. Supp. 3d 143, 158 (S.D.N.Y. 2015) ("Consideration does not require substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight.").

As a matter of educational policy, the SRO's conclusion that E.N. did not require special education services and programs in eighth grade is entitled to deference.  *See Cerra*, 427 F.3d at 191.  This is especially true where the Court's own review of the record—from E.N.'s reports cards, (*see, e.g.*, P-H; D-11), to her standardized testing results, (*see, e.g.*, D-44, at 5; D-45, at 5; D-46, at 1), to testimony by E.N.'s teachers, (*see, e.g.*, Tr. 456; *id.* at 720; *id.* at 736), to an evaluation by Plaintiffs' own private psychologist, (*see* P-B, at 2)—provides substantial support for that conclusion.[20]  Because "the IDEA's child find requirement only applies to children who

---

[20] At one point in their papers, Plaintiffs assert that E.N. "required special education services," (Pls.' Opp'n 7 (citing Tr. 234–35)), yet curiously cite to a section of the transcript that contains discussion among the IHO and the Parties' counsel about E.N.'s medication, (*see* Tr. 234–35).  This assertion thus lacks support in the record, and "unsupported allegations do not create a material issue of fact."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

are disabled *and* in need of special education and related services," *J.S.*, 826 F. Supp. 2d at 663; *see also Maus*, 688 F. Supp. 2d at 297 (explaining that "proof of an adverse impact on academic performance is a prerequisite for eligibility for special education services"), the Court will not upset the conclusion of the SRO (and the IHO) that there is no basis for an award of compensatory education for the 2010-11 school year.

### b.  The 2011-12 School Year (Ninth Grade)

Plaintiffs argue that the CSE's failure to convene a meeting or draft an IEP during the 2011-12 school year deprived E.N. of a FAPE for ninth grade.  (*See* Pls.' Opp'n 9–10.)  Pursuant to its child find obligation, a school district must evaluate a student within a reasonable time after notice or suspicion of a disability.  *See Murphy v. Town of Wallingford*, No. 10-CV-278, 2011 WL 1106234, at *3 (D. Conn. Mar. 23, 2011) ("Once a school has reason to suspect a disability, the school must conduct an evaluation of the child within a reasonable time." (internal quotation marks omitted)); *New Paltz Cent. Sch. Dist. v. St. Pierre ex rel. M.S.*, 307 F. Supp. 2d 394, 400 n.13 (N.D.N.Y. 2004) (explaining that the child find provisions "require that children be identified and evaluated within a reasonable time after school officials notice behavior likely to indicate a disability"); *accord Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012) (explaining that a child suspected of having a qualifying disability must be identified and evaluated "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability" (internal quotation marks omitted)).

As did the SRO, (*see* SRO Op. 16), this Court finds that the District remained obligated to evaluate E.N. even after Plaintiffs' placement of E.N. at Soundview, *see E.T. v. Bd. of Educ.*, No. 11-CV-5510, 2012 WL 5936537, at *14 (S.D.N.Y. Nov. 26, 2012) (noting "courts have recognized that residency, rather than enrollment, triggers a district's FAPE obligations"

(internal quotation marks omitted)); *J.S.*, 826 F. Supp. 2d at 665 ("[A] district-of-residence's obligations do not simply end because a child has been privately placed elsewhere . . . ."); *accord Bd. of Educ. v. Risen*, No. 12-CV-5073, 2013 WL 3224439, at *14 (N.D. Ill. June 25, 2013) ("[I]f the child's parents want their child to return to the public school district where they reside, and request that the district provide the child with a FAPE, the district is required to evaluate the child."); *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1069 (D.N.J. 2011) ("[W]here parents request reevaluations of their child for purposes of having an offer of a FAPE made for him, and the child is domiciled in the district, the school district must comply."). Nonetheless, the Court concludes that the delay in the referral of E.N. to the CSE was not unreasonable.[21]

Plaintiffs contacted the District regarding the evaluation process in March 2012, (*see* Tr. 1097–98; P-J), and the IHO correctly determined that this request obligated the District to evaluate E.N., (*see* IHO Op. 45 (finding that "the . . . [D]istrict was obligated to evaluate E.[N.] when requested to do so by [Plaintiffs] on March 28, 2012")).[22]  In response to Plaintiffs' May 8, 2012 letter requesting an "emergency CSE evaluation for [E.N.]," (D-12), the District provided

---

[21] To the extent Plaintiffs would argue that the timeline should date back to their written request for a CSE evaluation in December 2011, the Court reemphasizes that the SRO correctly determined that E.N. did not require special education services prior to the second half of the 2011-12 school year, (*see* SRO Op. 19–20), such that it cannot be said that the District was on notice of a disability during that period.  While Plaintiffs assert that "E[.]N[.]'s condition deteriorated" during the second semester of the 2011-12 school year, (Pls.' Opp'n 10), she was enrolled in an out-of-district private school at that time, (*see* D-48), and the record indicates that it was not until spring that District had notice or suspicion of a disability, (*see* Tr. 1097 (testimony by C.N. that Plaintiffs first contacted the District about the CSE process in March 2012); P-J).

[22] Because the Court assesses the timeline for the evaluation from this point, the misinformation provided by the District—that E.N had to be registered and attending a school in the District in order to be evaluated, (*see* Tr. 627–28; P-J)—did not extend the delay for purposes of this analysis.

Plaintiffs the necessary paperwork regarding the CSE referral on May 18th, (P-Q), and the evaluation process itself commenced by May 24th, (*see* D-7; *see also* D-5; D-6; D-8).  Thus, the length of time between Plaintiffs' request for an evaluation and the District's initiation of the evaluation process falls well below that in cases where courts have found a delay to be unreasonable.  *See, e.g.*, *Reg'l Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M.*, No. 07-CV-1484, 2009 WL 2514064, at *12–13 (D. Conn. Aug. 7, 2009) (finding that a six-month delay in evaluating a student for special education services "constituted a gross procedural violation that resulted ultimately in the inability to provide [the student] a FAPE"); *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 952 (W.D. Tex. 2008) (concluding that the school district violated its child find obligation because "the [13] months that passed between [the plaintiff's] request for evaluation and [the school district's] offer of evaluation was unreasonable"); *New Paltz Cent. Sch. Dist.*, 307 F. Supp. 2d at 401 (holding that a delay of approximately 10 months from notice to evaluation constituted a child find violation); *Dep't of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1195–97 (D. Haw. 2001) (finding a child find violation based on a delay of at least six months from the point at which the school had reason to suspect a disability to the scheduling of an evaluation).  Accordingly, this Court concludes that the evaluation occurred "within a reasonable time" after notice such that the District did not violate its child find obligation.  *See Dallas Indep. Sch. Dist. v. Woody*, No. 15-CV-1961, 2016 WL 1530311, at *19 (N.D. Tex. Apr. 15, 2016) (finding that the school district did not violate its child find obligation because the three-month delay in referring the student for an evaluation was reasonable).[23]

---

[23] The Court is unpersuaded by Plaintiffs' assertion, without citation to any legal authority, that their decision to enroll E.N. at Soundview "should have alerted [the District] to provide Plaintiffs with procedural safeguards."  (Pls.' Opp'n 9–10.)  It is quite the leap from informing the District that they desired a different type of educational environment for E.N., (*see id.* at 9), to presuming notice of a disability, (*see id.* at 10).  Plaintiffs' argument is also belied by

Further confirming this determination is the fact that Plaintiffs, in informing the District of E.N.'s disability and requesting an evaluation, were seeking placement for the 2012-13 school year, (*see* D-12), and an IEP was in effect prior to the start of that year, (*see* D-1; D-3; D-18).  As such, the delay neither interfered with E.N.'s education during her ninth grade year—since the District did not have notice until spring 2012, (*see* P-J)—nor prevented Plaintiffs from participating in the decision-making process—as the record reveals their active role in the CSE evaluation process, (*see, e.g.*, D-7; D-13; P-Q), and IEP development, (*see, e.g.*, D-1; D-17).

While the Court sympathizes with the trying circumstances faced by Plaintiffs in seeking the best possible education for E.N., it has not been established that the record fails to support the SRO's (or the IHO's) conclusion that E.N. was not denied a FAPE for the 2011-12 school year. Therefore, an award of compensatory education is not appropriate here.

2.  Whether Plaintiffs are Entitled to Tuition Reimbursement for the 2012-13 School Year

Plaintiffs challenge the SRO's determination "that Plaintiffs are not entitled to full reimbursement for tuition, clinical costs, and boarding [relating to their placement of E.N. at Grove]." (Pls.' Opp'n 11 (citing SRO Op. 30).)  As noted above, Plaintiffs may recover on their tuition reimbursement claim only by demonstrating that the District failed to offer E.N. a FAPE for the 2012-13 school year, that their unilateral placement of E.N. was appropriate, and that the equities support reimbursement.  The Court must first assess "whether the [District] has complied with the procedures set forth in the IDEA," and "whether the IEP[s] developed through the [IDEA]'s procedures [were] reasonably calculated to enable [E.N.] to receive educational benefits." *Cerra*, 427 F.3d at 192 (internal quotation marks omitted).

_____

the fact that E.N. did not receive any special education services or supports while at Soundview, (*see* Tr. 172), and that she attained passing grades through the first semester of the 2011-12 school year, (*see* D-11).

a.  Procedural Adequacy

This "initial procedural inquiry . . . is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (internal quotation marks omitted). Nonetheless, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Id.* (internal quotation marks omitted).  For procedures to be sufficient, they must provide

> [a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1).  Inadequate procedures warrant reimbursement only if, individually or cumulatively, they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decision[-]making process," or "caused a deprivation of educational benefits." *R.E.*, 694 F.3d at 190 (first alteration in original) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) ("[P]arents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process.").  "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.*, 694 F.3d at 190.

Plaintiffs challenge the SRO's determination that the District's failure to conduct an FBA or develop a BIP did not deny E.N. a FAPE for the 2012-13 school year.  (Pls.' Opp'n 13 (citing SRO Op. 21).)  Claiming "a serious procedural violation," they argue that the August 2012 IEP's recommendation of a therapeutic day program with the support of BASIS did not adequately

address E.N.'s needs and therefore did not remove the need to develop a BIP for E.N.  (*Id.* (internal question marks omitted).)[24]  Specifically, Plaintiffs contend that the "solution to provide an escort to meet E[.]N[.] at the bus and escort her into the building did not alleviate [their] elopement concerns, as that was not the only time during which E[.]N[.] may skip school."  (*Id.* at 13–14.)  Yet, as noted by the SRO, (*see* SRO Op. 24), at the August 2012 CSE meeting attended by Plaintiffs, (*see* D-3), a TSP-F representative explained that the program did not have an open campus policy and that its students were self-contained in a wing of the public high school, with a monitor at each end of the hallway who tracked students coming and going, (*see* Tr. 189–90; P-GG).  Moreover, notwithstanding their repeated reference to "elopement concerns," (*see, e.g.*, Pls.' Opp'n 13–14; *id.* at 16), Plaintiffs have provided no evidence that E.N. ever acted on any threats to elope, (*see* Tr. 192, 360–61, 1004–05; *cf.* SRO Op. 24).  Their mere speculation provides "no reason to depart from the SRO's finding that [the CSE's] recommendations were 'reasonably calculated to enable [E.N.] to receive educational

---

[24] This argument disregards an important aspect of the SRO's well-reasoned conclusion, which noted that "the value of conducting an FBA at Soundview would have been limited to [E.N.'s] functioning in that environment as opposed to in the recommended therapeutic day program . . . ."  (SRO Op. 24.)  Indeed, one of the stated purposes of an FBA is to determine "how the student's behavior relates to the environment," N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r), which means that "in certain circumstances a district can wait until after a student begins to attend a district school to conduct an FBA," *J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL 3975942, at *13 (S.D.N.Y. Aug. 5, 2013); *see also S.H. ex rel. W.H. v. Eastchester Union Free Sch. Dist.*, No. 10-CV-3927, 2011 WL 6108523, at *9 (S.D.N.Y. Dec. 8, 2011) (holding that the failure to conduct an FBA did not deny the student a FAPE where the "IEPs indicate[d] that a[n] [FBA] would be conducted and a [BIP] would be implemented at the beginning of the . . . school year" so as "to give [the student] an opportunity to be there and to acclimate to the program" (internal quotation marks omitted)).  Indeed, the August 2012 CSE specifically discussed that "the [TSP-F] program would need to wait for E.[N.] to actually become enrolled" before conducting an FBA and developing a BIP, so as "to be able to address the behaviors E.[N.] was exhibiting."  (Tr. 193.)

Benefits.'" *M.T. v. N.Y.C. Dep't of Educ.*, — F. Supp. 3d —, 2016 WL 1072491, at *9 (S.D.N.Y. Feb. 26, 2016) (quoting *Rowley*, 458 U.S. at 207).

In addition, Plaintiffs contend that they did not have the opportunity to speak with a representative from BASIS prior to making their placement decision. (*See* Pls.' Opp'n 13.)[25] Yet, like the SRO, (*see* SRO Op. 25 n.27), the Court finds this argument unavailing. The record confirms that BASIS was discussed at the August 2012 CSE meeting attended by Plaintiffs, (*see* Tr. 199–201, 314, 849–50; D-3), as well as during an August 2012 intake meeting that Plaintiffs and E.N. attended with Dr. Mann at BOCES, (*see id.* at 698–99; P-NN, at 1). Further belying Plaintiff's contention that they were not afforded sufficient information is the fact that Plaintiffs were provided with a written outline describing BASIS. (*See* Tr. 314.)[26] While Plaintiffs assert that "[n]either the CSE nor Dr. Mann were very familiar with BASIS' methodology," (Pls.' Opp'n 15 (citing Tr. 310–12, 708–09, 984)), the record tells a different story. Not only was Hayes able to offer a thorough explanation of BASIS during the impartial hearing, (*see* Tr. 312–13), but testimony by both Hayes and C.N. confirms that the August 2012 CSE discussed the services to be provided for E.N. through the program, (*see id.* at 200–01, 849–50).

As another argument in support of their claim that E.N. was denied a FAPE for her tenth grade year, Plaintiffs assert that the District "impeded [their] right to participate in the decision-making process by refusing to consider residential programs . . . ." (Pls.' Opp'n 14 (citing 20

---

[25] In alleging inadequate procedures, Plaintiffs complain that "the IHO fail[ed] to consider that no one from BASIS testified at the [impartial] hearing." (Pls.' Opp'n 13 (citing Tr. 315).) However, they offer no explanation on why such testimony was necessary and cite only to a transcript page that notes Plaintiffs did not "continue[] to follow through" in trying to speak with a BASIS representative. (Tr. 315.)

[26] It also bears mention that the District responded to Plaintiffs' concerns by providing contact information for an alternative behavioral program. (*See* P-U, at 3.)

U.S.C. § 1415(b)(1); *id.* § 1415(f)(3)(E)(ii)).)  Although "Plaintiffs and Dr. Damore strongly

recommended . . . a therapeutic boarding school," (*id.*), that the District did not defer to their

recommendation does not amount to a procedural violation, *see T.B. v. Haverstraw-Stony Point

Cent. Sch. Dist.*, 933 F. Supp. 2d 554, 571 (S.D.N.Y. 2013) ("[E]ducators must consider outside

expert reports, but they need not follow their recommendations."); *P.K. ex rel. P.K. v. Bedford

Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("A professional disagreement is not

an IDEA violation."); *Sch. For Language & Commc'n Dev. v. N.Y. State Dep't of Educ.*, No. 02-

CV-269, 2006 WL 2792754, at *7 (E.D.N.Y. Sept. 26, 2006) ("Meaningful participation does

not require deferral to parent choice.").  Indeed, "[t]he IDEA grants parents the right to provide

input, not to have veto power."  *S.W.*, 92 F. Supp. 3d at 157; *see also B.K.*, 12 F. Supp. 3d at 359

("The mere fact that the CSE's ultimate recommendation deviated from the[] [parents'] express

request . . . does not render the [p]arents 'passive observers' or evidence any predetermination on

the part of the CSE.").  In this case, the evidence shows that the District considered the

recommendation for a residential program, which was explicitly discussed at the July 2012 and

August 2012 CSE meetings attended by Plaintiffs.  (*See* Tr. 285–86; D-1, at 2; D-3, at 2.)[27]  In

doing so, the District met its procedural obligations.

---

[27] The latter IEP noted that Dr. Damore had recommended a residential program at the
July 2012 CSE meeting and that Hayes had "explained . . . that school districts are required to
recommend the least restrictive environment to meet a student's needs and to develop an IEP that
is reasonably calculated to meet that student's needs."  (D-3, at 2.)  This response is consistent
with established precedent, whereby the Second Circuit has observed that "it is appropriate to
proceed cautiously whenever considering such highly restrictive placements" given the "IDEA's
preference . . . for disabled children to be educated in the least restrictive environment capable of
meeting their needs."  *Walczak*, 142 F.3d at 132; *see also C.T. v. Croton-Harmon Union Free
Sch. Dist.*, 812 F. Supp. 2d 420, 433 (S.D.N.Y. 2011) ("[C]ourts in this district and the Second
Circuit are reluctant to find that a residential placement is required in the absence of clear
evidence indicating that such a placement is the child's only means of achieving academic
progress.").

b.  Substantive Adequacy

In reviewing for substantive errors, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits.  Substantive inadequacy automatically entitles the parents to reimbursement."  *R.E.*, 694 F.3d at 190 (alteration, citation, and internal quotation marks omitted).  Under the IDEA, a district is not required "to provide the very best educational opportunities and services possible, as the purpose of the IDEA is 'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'" *J.C. ex rel. C. v. New Fairfield Bd. of Educ.*, No. 08-CV-1591, 2011 WL 1322563, at *19 (D. Conn. Mar. 31, 2011) (quoting *Rowley*, 458 U.S. at 192); *see also C.H.*, 2013 WL 1285387, at *8 (noting that an IEP "need only provide the child with a 'basic floor of opportunity'" (quoting *Rowley*, 458 U.S. at 201)).  Additionally, the "special education and related services must be provided in the least restrictive setting consistent with a child's needs."  *Walczak*, 142 F.3d at 122.

Plaintiffs argue that "[t]he SRO erred in determining the BOCES and BASIS programs were reasonably calculated to address E[.]N[.]'s needs."  (Pls.' Opp'n 14 (citing SRO 24).)  To start, the Court notes that particular deference is owed to the SRO's determination regarding the July 2012 and August 2012 IEPs, as these are "precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers," *A.C.*, 553 F.3d at 172 (internal quotation marks omitted); *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."), and given that the SRO

reached the same conclusion "based on the same record as that before the . . . [C]ourt," *see B.K.*, 12 F. Supp. 3d at 360.

In contesting the substantive adequacy of the IEPs, Plaintiffs again highlight Dr. Damore's recommendation for a residential program, (*see* Pls.' Opp'n 14–15), and their opinion that a day program was inappropriate for E.N., (*see id.* at 16). Yet, as discussed above, the District had no obligation to defer to these views. *See, e.g., S.W.*, 92 F. Supp. 3d at 158; *T.B.*, 933 F. Supp. 2d at 571. Furthermore, as determined by the SRO, (*see* SRO Op. 24, 26), the record demonstrates that the IEPs were sufficiently "tailored to meet [E.N.'s] unique needs," *M.H.*, 685 F.3d at 224 (internal quotation marks omitted).[28] For example, while Plaintiffs contest the reduction in the amount of individual counseling from the July 2012 IEP to the August 2012 IEP as insufficient to meet E.N.'s needs, (*see* Pls.' Opp'n 16–17), the TSP-F representative explained during the August 2012 CSE meeting that the program is flexible in offering services to "make things work" for students with health demands, (*see* P-GG). In their opposition papers, Plaintiffs correctly note that courts "may not consider 'retrospective' testimony regarding services not listed in the IEP," (Pls.' Opp'n 17 (quoting *R.E.*, 694 F.3d at 174)), but the information regarding TSP-F's flexibility was provided "as of the time of [their] placement decision," *R.E.*, 694 F. 3d at 195, and was merely confirmed by Dr. Mann's testimony, (*see* Tr. 701 (testifying that "[a]nything extra could be negotiated")). The SRO thus correctly determined this change in the manner of delivery—from two 30-minute individual counseling sessions per week, (*see* D-1, at 1, 10), to one 30-minute individual counseling session per week and one 30-minute group counseling session per week (*see* D-3, at 1–2, 11)—"is not a basis for finding that

---

[28] Although Plaintiffs underscore that the District did not conduct its own psychiatric evaluation, (*see* Pls.' Opp'n 14–15), the record reveals that an updated psychiatric assessment was to be conducted after E.N. began at the recommended placement, (*see* Tr. 283).

the [D]istrict failed to offer [E.N.] a FAPE," (SRO Op. 27).  As another example, Plaintiffs insist

that the recommended day program "would not be structured or supervised enough" to meet

E.N.'s needs, (Pls.' Opp'n 16), but the August 2012 IEP specifically provided staffing for the

first 10 weeks of school to ensure that E.N. had no unsupervised time during the day, through

supervised lunch as well as an escort into and out of the building, (D-3, at 3).[29]  The CSE also

planned to reconvene after the first 10 weeks (or earlier upon parental request) to review E.N.'s

program.  (*Id.*)[30]  Notably, Plaintiffs do not dispute the goals and objectives contained in the

August 2012 IEP, (*see* Pls.' Resp. to Def.'s. Local Civil Rule 56.1 Statement of Material Facts

Not in Dispute ¶ 32 (Dkt. No. 76); *cf.* Tr. 1482), and at the August 2012 CSE meeting, a TSP-F

representative confirmed that the program could implement the IEP and support E.N.'s

individual needs, (*see* D-3, at 2; P-GG).  Dr. Mann also testified that BOCES could implement

all the services and goals contained in the August 2012 IEP.  (Tr. 673.)

Nevertheless, Plaintiffs contend that "BOCES was not capable of implementing

E[.]N[.]'s IEP" because it lacked "the services on the IEP" in that the TSP-F program had a

consulting psychiatrist onsite only every six weeks.  (Pls.' Opp'n 17 (citing Tr. 697–98).)  The

---

[29] Because the Court has already addressed the self-contained, highly-supervised
environment of TSP-F, (*see* Tr. 189–90), as well as the speculative nature of Plaintiff's oft-
repeated "elopement concerns," (*see id.* at 192, 360–61, 1004–05), it merely notes that such
evidence further belies Plaintiffs' arguments here as well.

[30] Even if the Court "were inclined to disagree" with the SRO's determination regarding
the appropriateness of the CSE's recommendation for the TSP-F program with the support of
BASIS (which it is not), "questions of class size, teaching methodologies[,] and educational
environments involve exactly the types of educational policy issues that require district court
deference to state administrative agencies."  *N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-5120,
2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011); *see also Mr. & Mrs. P.*, 546 F.3d at 118
("Independent judicial review 'is by no means an invitation to the courts to substitute their own
notions of sound educational policy for those of the school authorities they review.'" (quoting
*Rowley*, 458 U.S. at 206)).

Second Circuit has explained that "it is speculative" and impermissible "to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates," but "it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 244 (2d Cir. 2015) (citing *R.E.*, 694 F.3d at 195). It is also well established that the "test of a school's capacity to implement a student's IEP . . . is limited to facts uncovered by a parent *prior to* rejecting the placement option" and "does not permit litigants to establish a substantive violation based on facts discovered for the first time at an IHO hearing." *M.T.*, 2016 WL 1072491, at *9; *see also R.E.*, 694 F.3d at 187 ("In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties *at the time of the placement decision.*" (emphasis added)). Here, Plaintiffs have given no indication whatsoever that they learned of the information at issue—that a consulting psychiatrist visited the TSP-F program every six weeks, (*see* Tr. 697–98)—prior to rejecting the CSE-recommended placement, (*cf.* P-NN, at 2 (August 28, 2012 email from M.N. referencing description of TSP as providing "students [with] access to both psychotherapeutic and psychiatric services throughout the school day")). It thus cannot serve as the basis for their claim. *See M.T.*, 2016 WL 1072491, at *9 (explaining that "a plaintiff's claims . . . may not . . . rest on evidence regarding the proposed placement discovered after the parents had rejected the IEP"). In any event, Dr. Mann testified that BOCES could provide a weekly psychiatric consultation at an additional cost to the District, (Tr. 715), and that the school would be able to implement E.N.'s IEP, (*id.* at 673). This testimony reflects the flexibility of the TSP-F program as highlighted during the August 2012 CSE meeting, (*see* P-

GG), where the principal of the BOCES program "expressed the opinion that the program would be able to meet the goals [of E.N.'s IEP]," (D-3, at 2).

More broadly, Plaintiffs make much of a discussion with Dr. Mann regarding the number of social/emotional goals on E.N.'s IEP. (*See* Pls.' Opp'n 18 (citing Tr. 671–72, 714).)[31]  Yet at the impartial hearing, Dr. Mann testified that he had explained to Plaintiffs that the IEP contained too many social/emotional goals for him to track *personally*, (Tr. 714), but further testified that other school staff would be responsible for tracking some of the goals, (*id.* at 715–16).  Plaintiffs also conveniently ignore his testimony that BOCES' acceptance of E.N. into the program confirmed its ability to fully implement her IEP, (*see id.* at 671), which reflects the above-referenced discussion at the August 2012 CSE meeting, (*see* D-3, at 2; P-GG).  Thus, the record belies Plaintiffs' contention that the proposed placement could not provide the required services.  Because Plaintiffs have not met their burden of showing that BOCES lacked the capacity to implement E.N.'s IEP, *see J.M.*, 2016 WL 1092688, at *8 ("If a student's IEP is substantively adequate, it is incumbent upon the parents to adduce some evidence that the school could not or would not have adhered to the IEP." (citing *M.O.*, 793 F.3d at 245–46)); *S.W.*, 92 F. Supp. 3d at 162 n.9 (explaining that the "[p]laintiffs bear the burden of proof on prospective challenges to the adequacy of a proposed placement"), the Court rejects their concerns as speculative and "not an appropriate basis for unilateral placement," *R.E.*, 694 F.3d at 195; *see also J.D.*, 2015 WL 7288647, at *16 (finding that the "[p]laintiff's own testimony that [school] officials made comments to her indicating an inability to effectively serve [the student] do[es]

---

[31] In this regard, the Second Circuit has explained that "insofar as [the] plaintiffs relied on information from a single school official, they bore the risk that the school district would, in fact, satisfy its burden of proving the appropriateness of the challenged placement."  *B.P. v. N.Y.C. Dep't of Educ.*, 634 F. App'x 845, 848 (2d Cir. 2015) (summary order).

not come close to proving that the school was 'factually incapable' of implementing the IEP");

*S.E. v. N.Y.C. Dep't of Educ.*, 113 F. Supp. 3d 695, 711 (S.D.N.Y. 2015) (denying

reimbursement where the plaintiff failed to offer "hard evidence" that the proposed placement

was "factually incapable" of implementing the student's IEP (internal quotation marks omitted)).

"Absent non-speculative evidence to the contrary, it is presumed that the placement school will

fulfill its obligations under the IEP." *N.S. v. N.Y.C. Dep't of Educ.*, No. 13-CV-7819, 2014 WL

2722967, at *13 (S.D.N.Y. June 16, 2014).

Because this Court agrees with the SRO that the 2012-13 IEP was not procedurally or

substantively inadequate, it need not address whether Grove was an appropriate placement or

whether the equities favor tuition reimbursement. *See M.C.*, 226 F.3d at 66 ("Only if a court

determines that a challenged IEP was inadequate should it proceed to the second question.");

*M.H. v. N.Y.C. Dep't of Educ.*, No. 10-CV-1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16,

2011) (affirming "the SRO[']s decision as to the appropriateness of the IEP" and thus declining

"to consider the arguments relating to whether [the private school] constitute[d] an appropriate

placement and whether the equities favor reimbursement").

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The

Clerk of Court is respectfully requested to terminate the pending Motion, (Dkt. No. 71), enter

judgment for Defendant, and close the case.

SO ORDERED.

DATED:     September 14, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

41